**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Frank Micholle, Individually and on Behalf of All Others Similarly Situated, | Case No. _____ |
| Plaintiff, | CLASS ACTION |
| v. | |
| OPHTHOTECH CORPORATION, DAVID R. GUYER, MICHAEL G. ATIEH, GLENN P. SBLENDORIO, and SAMIR PATEL, | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Frank Micholle ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Ophthotech Corporation ("Ophthotech" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by Ophthotech, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf beha1f of all persons who purchased or otherwise acquired Ophthotech common stock between May 11, 2015, and December 12, 2016, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Ophthotech is a clinical stage biopharmaceutical company specializing in the development of novel therapeutics to treat back of the eye diseases, with a focus on developing innovative therapies for age-related macular degeneration ("AMD"). AMD is a disorder of the central portion of the retina, which is responsible for central vision and color perception. AMD patients most often experience symptoms such as blurred vision or blind spots in their visual field caused by abnormal blood vessels that leak fluid or blood into the part of the retina responsible for central vision.

3.      Throughout the Class Period, the Company's most advanced product candidate was Fovista, an anti-platelet derived growth factor ("PDGF") aptamer. As a PDGF aptamer, Fovista was designed to block proteins that bind to cells on the outer lining of blood vessels. Fovista was to be administered in combination with anti-vascular endothelial growth factor ("VEGF") agents, a standard of care for the treatment of wet AMD. Similar to PDGF aptamers, anti-VEGF agents are designed to block proteins that bind to cells on the inner lining of blood vessels. By combining PDGF aptamers (like Fovista) and anti-VEGF agents, proteins on both the inner and outer lining of blood vessels which cause growth and leakage would be blocked, promoting blood vessel regression and reducing scarring.

4.      After reporting purportedly positive results from the phase 1 and phase 2 clinical trials, Ophthotech initiated two phase 3 clinical trials (OPH1002 and OPH1003) designed to test

Fovista in combination with Lucentis, a commercially available anti-VEGF agent marketed by Novartis.   The two phase 3 clinical trials were international, multicenter, randomized, double-masked, studies evaluating the safety and efficacy of 1.5 mg of Fovista administered in combination with Lucentis compared to Lucentis as a monotherapy.

5.      A total of 1,248 patients over the age of 50 were enrolled across both studies (621 patients in the OPH1002 study and 627 patients in the OPH1003 study) and were randomized to receive either Fovista in combination with Lucentis or Lucentis alone each month up to the 12 month primary endpoint of the study. The primary efficacy endpoint in both studies was defined as the mean change in best corrected visual acuity (BCVA) from baseline at 12 months, with diverging secondary and exploratory efficacy endpoints.  Accordingly, to be deemed clinically successful, the combination of Fovista and Lucentis in the phase 3 trials merely had to perform marginally better than Lucentis alone.

6.      Patient enrollment was completed in the two phase 3 trials in May 2015 and November 2015, respectively.  When a clinical trial is fully enrolled, this means every potential patient has been treated and the data is thereafter collected and analyzed.  Since May 2015, Ophthotech and certain of its officers and directors have misrepresented the efficacy of Fovista, and its attendant capacity for approval by the U.S. Food and Drug Administration ("FDA"). For example, these materially false and misleading statements included, among others, that Fovista:

- "[I]s well position[ed] to potentially be first to market in this class of novel therapy for wet AMD;"

- "[R]epresent[s] a significant advancement in the treatment of wet AMD…[and] a new class of therapy and improving visual outcome for wet AMD patients;"

- Has made "significant progress related to [its] clinical development;" and

- "Is the most advanced anti-PDGF agent in development for the treatment of wet AMD and, if approved, is expected to be first to market."

7.     On December 12, 2016, Ophthotech issued a press release announcing results of the two pivotal phase 3 trials of Fovista. The Company disclosed that Fovista, administered in combination with Lucentis, had failed to achieve its primary endpoint of visual acuity at 12 months compared to Lucentis administered as a monotherapy under the guidelines established by the FDA.  Specifically, the combined analysis from the trials showed that patients who received Fovista and Lucentis in combination only demonstrated a mean gain of 10.24 letters on a standardized eye chart at 12 months, a non-statically significant improvement over the 10.01-letter gain observed in the patient group that only received Lucentis as a monotherapy.

8.     On this news, the price of Ophthotech common stock declined from a closing share price of $38.77 per share on December 9, 2016, to a closing share price of $5.29 per share on December 12, 2016, a loss of approximately 86% on extremely heavy trading volume.

## JURISDICTION AND VENUE

9.     The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), as well as under the common law.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. §78aa.

11.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of false and misleading statements were made in or issued from this District. Ophthotech is headquartered in this District, with its principal place of business located at One Penn Plaza, 19th Floor, New York, New York 10119.

## PARTIES

13.     Plaintiff purchased Ophthotech securities within the Class Period as set forth herein and in his certification filed herewith.

14.     Defendant Ophthotech is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at One Penn Plaza, 19th Floor, New York, New York 10119. The Company's common stock trades on the NasdaqGS ("NASDAQ") under the symbol, "OPHT."

15.     Defendant David R. Guyer ("Guyer") has been the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors since 2007.

16.     Michael G. Atieh ("Atieh") was the Company's Chief Financial and Business Officer, Executive Vice President and Chief Operating Officer from September 30, 2014 to April 1, 2016.  The Company issued a press release on January 5, 2016 announcing Atieh had resigned from his positions, effective April 1, 2016.

17.     Defendant Glenn P. Sblendorio ("Sblendorio") has been the Company's Chief Financial and Business Officer, Executive Vice President and Chief Operating Officer since April 1, 2016.

18.     Defendant Samir Patel ("Patel") has been the Company's President and Vice Chairman of the Board of Directors since 2007.

19.     Defendants in Paragraphs 16-19 are collectively referred to herein as the "Individual Defendants."

20.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)     was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)     approved or ratified these statements in violation of the federal securities laws.

21.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Ophthotech's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

22.     As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Ophthotech's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

24.     Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Ophthotech's securities by

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Ophthotech's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase Ophthotech securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Company Background

25.     Ophthotech is a clinical-stage biopharmaceutical company specializing in the development of novel therapeutics to treat back of the eye diseases, with a focus on developing innovative therapies for age-related macular degeneration (AMD). AMD is a disorder of the central portion of the retina, which is responsible for central vision and color perception.

26.     The Company's most advanced product candidate during the Class Period was Fovista, a PDGF aptamer. As a PDGF aptamer, Fovista was designed to block proteins that bind to cells on the outer lining of blood vessels. Fovista was to be administered in combination with VEGF agents, a standard of care for the treatment of wet AMD. Similar to PDGF aptamers, anti-VEGF agents are designed to block proteins that bind to cells on the inner lining of blood vessels. By combining PDGF aptamers (like Fovista) and anti-VEGF agents, proteins on both the inner and outer lining of blood vessels which cause growth and leakage would be blocked, promoting blood vessel regression and reducing scarring.

27.     Prior to the Class Period, the Company had completed phase 1 and phase 2 studies evaluating Fovista in combination with the anti-VEGF Lucentis (ranibizumab), and had initiated multiple extension trials to evaluate Fovista in combination with other commercially available anti-VEGF agents.  For instance, Ophthotech announced the results of its phase 2b clinical study of Fovista in combination with Lucentis on June 13, 2012, in a press release entitled "*Anti-PDGF*

*(1.5 mg) Combination Therapy Resulted in Additional 62% Increase in Visual Outcome Compared to Lucentis® Monotherapy*." The Phase 2b study was a prospective, randomized, controlled clinical trial of 449 patients with wet AMD, and a primary endpoint of mean vision gain.

28.    The press release announcing the purportedly positive phase 2b results stated in relevant part:

> Princeton, NJ – June 13, 2012 – **Ophthotech Corporation today announced results from the first clinical trial to show statistically significant superior efficacy over Lucentis® (ranibizumab) monotherapy for the treatment of neovascular age-related macular degeneration (wet AMD).**
>
> In a prospective, randomized, controlled Phase 2b clinical trial of 449 patients with wet AMD, Ophthotech's FovistaTM anti-PDGF therapy (1.5 mg), administered in combination with Lucentis anti-VEGF therapy, met the pre-specified primary efficacy endpoint of mean vision gain. **Patients receiving the combination of Fovista (1.5 mg) and Lucentis gained a mean of 10.6 letters of vision on the ETDRS standardized chart at 24 weeks, compared to 6.5 letters for patients receiving Lucentis monotherapy (p=0.019), representing a 62% additional benefit.** No significant safety issues were observed for either treatment group in the trial.
>
> **Enhanced visual outcomes of Fovista anti-PDGF (1.5 mg) combination therapy as compared to Lucentis monotherapy were demonstrated at every monthly timepoint.** In addition, the relative magnitude of visual benefit continued to increase over time. The visual benefit of anti-PDGF (1.5 mg) combination therapy compared to Lucentis monotherapy was greater at the 6-month timepoint than at the 3-month timepoint. The increasing divergence of the efficacy curves suggests the benefit of chronic anti-PDGF combination therapy. A classic dose-response curve was observed.
>
> "**This is a truly remarkable finding for patients with wet AMD. To achieve a 62% relative visual benefit over anti-VEGF monotherapy is extraordinary**," commented retina specialist Carmen A. Puliafito, M.D., Dean of the Keck School of Medicine at the University of Southern California. "**The very compelling and robust results of this well-executed study validate PDGF as an important target for wet AMD and set the stage for a new era of combination therapy via co-formulation or fixed-combination delivery. I look forward to the rapid development of this important drug for our patients.**"

The robust benefit of Fovista anti-PDGF (1.5 mg) combination therapy over Lucentis monotherapy was consistent across all subgroups including those analyzing baseline vision, lesion size and the proportion of patients gaining 1, 2, 3, 4 and 5 lines of vision (ETDRS standardized chart). An average absolute benefit of 7.4% over Lucentis monotherapy was present across all ETDRS lines of vision gain. In addition, a relative benefit of 25% over Lucentis monotherapy was attained in patients who gained 3 or more lines of vision, with 69% and 178% relative benefit in patients gaining 4 or more and 5 or more lines of vision, respectively.

Donald J. D'Amico, M.D., Professor and Chairman of Ophthalmology at the Weill Cornell Medical College, added, "**This breakthrough study is a major step forward in our treatment of patients with wet AMD and represents a clear paradigm shift. This convincing study shows clinically significant improvements in visual outcomes in all patient subgroups over six months. In addition to delivering the promise of enhanced visual gain, I am delighted with the potential of pairing this anti-PDGF entity with any of the increasing number of anti-VEGF agents in the marketplace.**"

"**We are very encouraged by the strong and consistent enhanced efficacy demonstrated in this large trial**," stated Samir Patel, M.D., Co-Founder, President and Chief Executive Officer of Ophthotech. "**Based on these results, Ophthotech plans to expedite the preparation of a Phase 3 registration program with the goal of bringing Fovista anti-PDGF therapy to patients with wet AMD as soon as possible**."

Emphasis Added.

29.     Accordingly, the phase 2b trial results purportedly established that Fovista in combination with Lucentis, as compared to Lucentis alone, was nearly 62% more effective in producing higher average visual acuity gain at the 24-week time point in patients.  More specifically, the Lucentis-alone group improved an average of 6.5 letters after 24 weeks, as opposed to the combination group, which improved 10.6 letters after 24 weeks.

30.     Based on these results, the Company conducted its initial public offering ("IPO") in September 2013, which closed on September 30, 2013 after offering 8,740,000 shares of common stock at a public offering price of $22 per share.  Only months thereafter, the Company

conducted a secondary public offering in February 2014. As such, on February 18, 2014, Ophthotech announced the closing of its registered secondary public offering of 2,628,571 shares of its common stock at a price of $31.50 per share (together with the IPO, the "Offerings.")

31.     Throughout the Offerings, Ophthotech reiterated numerous times that the phase 2b trial results supported and validated the efficacy of Fovista in combination with Lucentis for the treatment of wet AMD.  Thereafter, the Company used the proceeds from the Offering to initiate two phase 3 clinical trials (OPH1002 and OPH1003) designed to test Fovista in combination with Lucentis.  The two phase 3 clinical trials were international, multicenter, randomized, double-masked, studies evaluating the safety and efficacy of 1.5 mg of Fovista administered in combination with Lucentis compared to Lucentis as a monotherapy.

32.     A total of 1,248 patients over the age of 50 were enrolled across both studies (621 patients in the OPH1002 study and 627 patients in the OPH1003 study) and were randomized to receive either Fovista in combination with Lucentis or Lucentis alone each month up to the 12 month primary endpoint of the study. The primary efficacy endpoint in both studies was defined as mean change in best corrected visual acuity (BCVA) from baseline at 12 months, with diverging secondary and exploratory efficacy endpoints.  Accordingly, to be deemed clinically successful, the combination of Fovista and Lucentis in the phase 3 trials merely had to perform marginally better than Lucentis alone. Patient enrollment was completed in the two phase 3 trials in May 2015 and November 2015, respectively.

**Material Misstatements and Omissions**

33.     On May 11, 2015, the beginning of the Class Period, Ophthotech issued a press release announcing that the Company had completed enrollment for its first Phase 3 trial of Fovista in

combination with Lucentis. In the press release, Defendant Guyer touted the efficacy and outlook of Ophthotech's lead drug candidate, Fovista. In relevant part, Defendant Guyer stated:

> **We are excited with the progress of the Fovista® Phase 3 pivotal program and reaching our first major recruitment milestone.** We have focused our resources on obtaining our initial, topline data in 2016. Given the Fast Track status granted by the FDA for Fovista® for the treatment of wet AMD, **we believe that Fovista® administered in combination with anti-VEGF therapy is well positioned to potentially be first to market in this class of novel therapy for wet AMD.**

Emphasis Added.

34.     Soon thereafter, on August 5, 2015, Ophthotech issued a press release announcing the Company's financial and operating results for the second fiscal quarter ended June 30, 2015. For the quarter, the Company reported a net loss of $37.1 million, or ($1.08) per diluted share, compared to a net loss of $73.0 million, or ($2.19) per diluted share, for the same period in 2014. For the six months ended June 30, 2015, the Company reported a net loss of $30.5 million, or ($0.89) per diluted share, compared to a net loss of $93.7 million, or ($2.85) per diluted share, for the same period in 2014. Most pertinently, however, the Company also stated that it had achieved "significant milestones" with respect to its Phase 3 Fovista program, stating in relevant part:

> '**During the first half of 2015, Ophthotech achieved several significant milestones, particularly with regard to the execution of our ongoing Fovista® Phase 3 program with the completion of patient recruitment of the first Phase 3 trial of Fovista® in combination with Lucentis®,' said David Guyer, M.D., Chief Executive Officer and Chairman of the Board of Ophthotech.** 'We remain focused on the continued execution of the Fovista® Phase 3 program. We look forward to the completion of enrollment of the second Phase 3 Fovista® in combination with Lucentis® trial, the release of initial interim data from of our Fovista® retinal fibrosis study, and the initiation of our Phase 2/3 dry AMD program with Zimura®.'

Emphasis Added.

35.     On October 26, 2015, Ophthotech issued a press release announcing that the Company completed enrollment for its second Phase 3 trial of Fovista in combination with Lucentis ("October 2015 Press Release.") The press release stated in relevant part:

> Ophthotech    Corporation    (Nasdaq:OPHT)    today    announced    the completion of patient recruitment for its second Phase 3 trial of Fovista® (pegpleranib) in combination with Lucentis® (ranibizumab) for the treatment of wet age-related macular degeneration (AMD). The Company expects to announce initial, topline data from both Phase 3 trials of Fovista® in combination with Lucentis® in the fourth quarter of 2016.
>
> **'Completion of patient recruitment in these two large scale Phase 3 clinical trials of Fovista® anti-PDGF therapy in combination with Lucentis® is a significant milestone in the Fovista® Phase 3 pivotal program,' stated David R. Guyer, M.D., Chief Executive Officer and Chairman of the Board of Ophthotech. 'We believe that Fovista® administered in combination with anti-VEGF therapy may represent a significant advancement in the treatment of wet AMD, and we look forward to obtaining data from both of these studies.'**
>
> **'We are excited with the progress of the Phase 3 Fovista® clinical development program and grateful for the diligence and commitment of the participating clinical investigators,' stated Samir Patel, M.D., President and Vice-Chairman of the Board of Ophthotech.** 'The effects of wet AMD are debilitating and represent a significant unmet need. Completion of recruitment in this study brings us one step closer to our goal of potentially introducing a new class of therapy and improving visual outcome for wet AMD patients.'

Emphasis Added.

36.     Days later, on November 5, 2015, Ophthotech issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2015. For the quarter, the Company reported a net loss of $39.6 million, or ($1.14) per diluted share, compared to net income of $10.9 million, or $0.31 per diluted share, for the same period in 2014. The Company also stated that both Phase 3 trials were "progressing well" and making "excellent progress." The press release stated in relevant part:

Ophthotech Corporation (Nasdaq:OPHT) today announced financial results for the third quarter ended September 30, 2015 and provided an update on the Company's business and product development programs.

**'We have achieved many significant milestones that have us on track to reach our goal to provide initial, topline data from both Phase 3 trials of Fovista® in combination with Lucentis in the fourth quarter of 2016,' said David R. Guyer, M.D., Chief Executive Officer and Chairman of the Board of Ophthotech.**

In October 2015, Ophthotech announced the completion of patient recruitment in its second Phase 3 trial of Fovista® (pegpleranib) in combination with Lucentis® (ranibizumab) for the treatment of wet age-related macular degeneration (AMD). The Company expects to announce initial, topline data from both Phase 3 trials of Fovista® in combination with Lucentis® in the fourth quarter of 2016. A third Phase 3 trial, which is investigating Fovista® in combination with either Eylea® (aflibercept) or Avastin® (bevacizumab), continues to enroll patients and is on track.

Recruitment has been completed in two of the Fovista® Expansion Studies. These trials are investigating the optimal regimen for Fovista® administration in combination with multiple anti-VEGF agents to potentially reduce sub-retinal fibrosis and treatment burden in wet AMD patients. **Both trials are ongoing and progressing well.**

**'This is an exciting time for Ophthotech as we approach the end of 2015,' stated Samir Patel, M.D., President and Vice-Chairman of the Board of Ophthotech. 'We continue to make excellent progress on our Fovista® expansion studies** and, in particular, in our anti-fibrosis program with respect to which we look forward to reporting interim data by the end of the year. Additionally, our plans to initiate a Phase 2/3 dry AMD program with Zimura® by the end of the year continue to be on track.'

Emphasis Added.

37.     Also on November 5, 2015, Ophthotech filed a Form 10-Q with the SEC announcing the Company's financial and operating results for the third fiscal quarter and nine-months ended September 30, 2015, ("Q3 2015 10-Q"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. Throughout the Q3 2015 10-Q the company reaffirmed the previous statements.

38.     On February 24, 2016, Ophthotech issued a press release announcing the Company's financial and operating results for the fourth quarter and full year ended December 31, 2015. The Company reported a net loss for the quarter ended December 31, 2015 of $35.6 million, or ($1.02) per diluted share, compared to a net loss of $31.7 million, or ($0.94) per diluted share for the same period in 2014. For the year ended December 31, 2015, the Company reported a net loss of ($105.7) million, or ($3.06) per diluted share, compared to a net loss of $116.8 million, or ($3.51) per diluted share, for the same period in 2014. Nevertheless, Defendants falsely represented in the February 24 press release that Ophthotech was "well positioned" for success in 2016 as a result of the Company's "significant progress related to the development of" Fovista:

> **"We are well positioned to build on the strong momentum that we achieved in 2015," said David R. Guyer, M.D., Chief Executive Officer and Chairman of the Board of Ophthotech. "We look forward to providing initial, topline data from both Phase 3 trials of Fovista® in combination with Lucentis® in the fourth quarter of this year. We have made significant progress related to the clinical development of both Fovista®** and Zimura®. In 2016, we will continue to build upon our commitment to develop novel therapeutics that address the significant unmet medical need to treat diseases of the back of the eye."

Emphasis Added.

39.     The Company's full financial and operating results for the fourth fiscal quarter and year ended December 31, 2015, were issued in a Form 10-K filed with the SEC on February 26, 2016 ("2015 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. Throughout the 2015 10-K, the Company repeated the previous statements touting the efficacy and outlook of Fovista and its phase 3 clinical trial development.

40.     Finally, on June 20, 2016, Ophthotech issued a press release announcing that Fovista is the "***most advanced anti-PDGF agent in development***" for wet AMD treatment. Emphasis Added. The press release further stated in relevant part:

The FDA granted Fast Track status for Fovista® for the treatment of wet AMD in September 2013. **The Company believes Fovista® is the most advanced anti-PDGF agent in development for the treatment of wet AMD and, if approved, is expected to be first to market in this class of novel therapies for wet AMD.**

Emphasis Added.

41.     Similar overtly positive representations continued in Form 10-Q's, Form 8-K's, and Company press releases filed or issued throughout the Class Period. As investors would soon realize, however, these statements were false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, these statements were false and/or misleading because the Company's management was well aware that the phase 3 clinical trials of Fovista would fail to achieve their primary endpoint of change in best corrected visual acuity (BCVA) from baseline at 12 months over Lucentis alone because: (i) Lucentis' gain of vision in the Phase 2b clinical trial was not representative of Lucentis' actual performance and rather, was abnormal; (ii) Fovista's gain of vision in the Phase 2b clinical trial was therefore biased; (iii) Ophthotech thus inappropriately relied on its Phase 2b results as a mean of touting its Phase 3 clinical trial of Fovista; and (iv) as a result of the foregoing, Defendants' statements about Ophthotech's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**The Truth Emerges**

42.     On December 12, 2016, Ophthotech issued a press release announcing that Fovista, administered in combination with Lucentis, had failed to achieve its primary endpoint of visual acuity at 12 months compared to Lucentis administered as a monotherapy under the guidelines established by the FDA.  Specifically, the combined analysis from the trials showed that patients who received Fovista and Lucentis in combination only demonstrated a mean gain of 10.24 letters

on a standardized eye chart at 12 months, a non-statically significant improvement over the 10.01-letter gain observed in the patient group that only received Lucentis as a monotherapy.  The press release stated in relevant part:

> **"Ophthotech Corporation (Nasdaq:OPHT) today announced that the pre-specified primary endpoint of mean change in visual acuity at 12 months was not achieved** in its two pivotal Phase 3 clinical trials investigating the superiority of Fovista® (pegpleranib) anti-PDGF therapy in combination with Lucentis® (ranibizumab) anti-VEGF therapy compared to Lucentis® monotherapy for the treatment of wet age-related macular degeneration (AMD).  **The addition of Fovista® to a monthly Lucentis® regimen did not result in benefit as measured by the mean change in visual acuity at the 12 month time point.**

> **'We are very disappointed in the results from these trials, particularly for patients afflicted with wet AMD,' commented David R. Guyer, M.D., Chief Executive Officer of Ophthotech.** 'We are thankful to the patients and clinical investigators and their staff for participating in the trials. We will continue to analyze the data from these two studies to better understand the trial results.'

> "The combined analysis from the two trials (OPH1002 and OPH1003) showed that patients receiving Fovista® combination therapy gained a mean of 10.24 letters of vision on the Early Treatment of Diabetic Retinopathy Study (ETDRS) standardized chart at 12 months, compared to a mean gain of 10.01 ETDRS letters for patients receiving Lucentis® monotherapy, a difference of 0.23 ETDRS letters. In OPH1002, consisting of 619 treated patients, subjects receiving Fovista® combination therapy gained a mean of 10.74 letters of vision on the ETDRS standardized chart at 12 months, compared to a mean gain of 9.82 ETDRS letters in patients receiving Lucentis® monotherapy, a resulting difference of 0.92 ETDRS letters (p=0.44). In OPH1003, consisting of 626 treated patients, subjects receiving Fovista® combination therapy gained a mean of 9.91 letters of vision on the ETDRS standardized chart at 12 months, compared to a mean gain of 10.36 ETDRS letters in patients receiving Lucentis® monotherapy, a resulting difference of -0.44 ETDRS letters (p=0.71). **None of these results of the pre-specified primary efficacy analysis were statistically significant.**

> In the pooled analysis of pre-specified secondary endpoints from both trials, 24.2% of patients receiving Fovista® combination therapy gained 20 or more ETDRS letters from baseline at month 12, compared to 22.1% of patients receiving Lucentis®monotherapy. In OPH1002, 25.9% of

patients receiving Fovista® combination therapy gained 20 or more ETDRS letters from baseline at month 12, compared to 20.0% of patients receiving Lucentis® monotherapy. In OPH1003, 22.5% of patients receiving Fovista® combination therapy gained 20 or more ETDRS letters from baseline at month 12, compared to 24.1% of patients receiving Lucentis® monotherapy.

In the pooled analysis, 12.1% of patients receiving Fovista® combination therapy **lost 5 or more ETDRS letters from baseline at month 12**, compared to 11.2% of patients receiving Lucentis® monotherapy. In OPH1002, 12.0% of patients receiving Fovista®combination therapy **lost 5 or more ETDRS letters at month 12**, compared to 12.3% of patients receiving Lucentis® monotherapy. In OPH1003, 12.2% of patients receiving Fovista® combination therapy **lost 5 or more ETDRS letters at month 12**, compared to 10.2% of patients receiving Lucentis® monotherapy.

In addition, in the pooled analysis, 13.5% of patients receiving Fovista® combination therapy achieved visual acuity of 20/25 or better at month 12, compared to 13.9% of patients receiving Lucentis® monotherapy. In OPH1002, 13.6% of patients receiving Fovista® combination therapy achieved visual acuity of 20/25 or better, compared to 13.2% of patients receiving Lucentis®monotherapy. In OPH1003, 13.5% of patients receiving Fovista® combination therapy achieved visual acuity of 20/25 or better, compared to 14.6% of patients receiving Lucentis® monotherapy.

**Based on a preliminary analysis of the safety data from these two trials, Fovista® combination therapy and Lucentis® monotherapy were generally well tolerated after one year of treatment.** The ocular adverse events more frequently reported in the Fovista® combination therapy group compared to the Lucentis® monotherapy group were mainly related to the injection procedure. The incidence of reported serious systemic adverse events was generally similar in both treatment groups as was the incidence of myocardial infarction or cerebrovascular accident."

Emphasis Added.

43.     On this news, the price of Ophthotech common stock declined from a closing share price of $38.77 per share on December 9, 2016, to close at $5.29 per share on December 12, 2016, a loss of approximately 86% on extremely heavy trading volume.

## SCIENTER ALLEGATIONS

44.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Ophthotech, their control over, and/or receipt and/or modification of Ophthotech's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Ophthotech, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

45.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's securities. As detailed above, when the truth about Ophthotech's misconduct and its lack of operational and financial controls was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Ophthotech's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the

Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

46.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Ophthotech's business, operations and financial condition, as alleged herein.  Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Ophthotech's securities to be artificially inflated.  Plaintiff and other Class members purchased Ophthotech's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

47.     At all relevant times, the market for Ophthotech securities was an efficient  market for the following reasons, among others:

> (a)  Ophthotech securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

> (b)  During the Class Period, Ophthotech securities were actively traded, demonstrating a strong presumption of an efficient market;

> (c)  As a regulated issuer, Ophthotech filed with the SEC periodic public reports during the Class Period;

> (d)  Ophthotech regularly communicated with public investors via established market

communication mechanisms;

(e) Ophthotech was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Ophthotech was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

48.     As a result of the foregoing, the market for Ophthotech securities promptly digested current information regarding Ophthotech from all publicly available sources and reflected such information in Ophthotech's stock price.  Under these circumstances, all purchasers of Ophthotech securities during the Class Period suffered similar injury through their purchase of Ophthotech's securities at artificially inflated prices, and a presumption of reliance applies.

49.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures.  Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.  Here, the facts withheld are material because an investor would have considered the Company's true net losses and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Ophthotech.

**NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE**

50.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

51.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

52.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Ophthotech who knew that the "forward-looking statement" was false.  Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

**CLASS ACTION ALLEGATIONS**

53.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Ophthotech securities on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family

members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

54.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Ophthotech securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Ophthotech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  As of August 1, 2016, Ophthotech had 35,697,696 outstanding shares of common stock.  Upon information and belief, these shares are held by thousands of individuals located geographically throughout the country.  Thus, joinder would be impracticable.

55.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

56.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)     whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;

(b)      whether the Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)      whether the price of Ophthotech securities during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(d)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

58.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
## Violation of Section 10(b) and Rule 10b-5 Against All Defendants

59.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.      This Count is asserted by Plaintiff on behalf of himself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

61.      During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Ophthotech securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

62.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Ophthotech securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

63.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Ophthotech as specified herein.

64.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ophthotech's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Ophthotech and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Ophthotech securities during the Class Period.

65.     The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or

agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

66.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Ophthotech's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of the Company's financial condition and business operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

67.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Ophthotech's securities

was artificially inflated during the Class Period. In ignorance of the fact that market prices of Ophthotech's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Ophthotech's securities at artificially high prices and were damaged thereby.

68.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Ophthotech's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Ophthotech securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

<u>**COUNT II**</u>
<u>**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**</u>

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of Ophthotech within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

72.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

      (a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

      (b)     Awarding compensatory damages in favor of Plaintiff and the other members

of the Class against all Defendants, jointly and severally, for all damages
sustained as a result of the Defendants' wrongdoing, in an amount to be proven
at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred
in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law;
and

(e)     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial.

Dated: January 11, 2017                       _/s/ Shannon L. Hopkins_____

                                              **LEVI & KORSINSKY, LLP**
                                              Shannon L. Hopkins (1887)
                                              Sebastiano Tornatore (0304)
                                              Meghan Daley (*to be admitted pro hac vice*)
                                              LEVI & KORSINSKY, LLP
                                              733 Summer Street, Suite 304
                                              Stamford, Connecticut 06901
                                              Telephone:  (203) 992-4523
                                              Facsimile:  (212) 363-7171

                                              *Counsel for Plaintiff and Proposed Lead Counsel*
                                              *for the Class*

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, Frank Micholle, duly certify and say, as to the claims asserted under the federal securities laws, that:

1.      I reviewed the complaint and authorized its filing

2.      I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      My transaction(s) involving Ophthotech Corporation securities which are the subject of this litigation during the class period (are) set forth in the chart attached hereto.

5.      Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct. Executed this ___10___ day of January 2017.

Signed: _____
          Frank Micholle

Frank Micholle
Transactions in Ophthotech Corporation ("OPHT")
Class Period: May 11, 2015 to December 12, 2016, inclusive

| Date of Transaction | Type of Transaction | Quantity | Price ($) | Cost/ Proceeds ($) |
|---|---|---|---|---|
| 11/22/2016 | Purchase | 300 | $37.40 | $11,229.99 |