UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

FRANK MICHOLLE, Individually and on
Behalf of All Others Similarly Situated,

                        Plaintiff,

    vs.

OPHTHOTECH CORPORATION, DAVID R.
GUYER and SAMIR PATEL,

                    Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:17-cv-00210-VSB
**(Consolidated)**

<u>CLASS ACTION</u>

**MEMORANDUM OF LAW IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

                                                                                    **Page**

I.    INTRODUCTION ............................................................................................1

II.   STATEMENT OF FACTS COMMON TO THE CLASS ...................................2

III.  ARGUMENT ..................................................................................................6

      A.    Applicable Legal Standards for Class Certification..............................6

      B.    The Proposed Class Satisfies the Requirements of Rule 23(a).............................7

            1.    The Class Is so Numerous that Joinder Is Impracticable............................7

            2.    Common Questions of Law and Fact Exist ................................................8

            3.    Lead Plaintiff's Claims are Typical of Those of the Class .........................9

            4.    Lead Plaintiff Will Fairly and Adequately Represent the Class ...............10

      C.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)........................13

            1.    Common Questions of Law and Fact Predominate ..................................13

                  a.    Lead Plaintiff Is Entitled to the Fraud-on-the-Market
                        Presumption of Reliance ................................................................14

                  b.    Ophthotech Stock Traded in an Efficient Market During the
                        Class Period ..................................................................................15

                        (1)    *Cammer* Factor 1: Ophthotech Stock Experienced a
                               High Weekly Trading Volume...........................................17

                        (2)    *Cammer* Factor 2: Numerous Securities Analysts
                               and Media Outlets Covered and Reported on
                               Ophthotech ........................................................................17

                        (3)    *Cammer* Factor 3: The Presence of Market Makers
                               Is Indicative of Market Efficiency ....................................18

                        (4)    *Cammer* Factor 4: Ophthotech was Eligible to File a
                               Form S-3 Registration Statement.......................................19

                        (5)    *Cammer* Factor 5: Ophthotech Stock Reacted to
                               Unexpected Company-Specific Information,
                               Demonstrating a Cause-and-Effect Relationship..............19

(6)     The *Krogman* Factors Also Support a Finding of
Market Efficiency ............................................................21

c.     Damages May be Calculated on a Class-Wide Basis Using
a Common Methodology ..................................................22

2.     A Class Action Is Superior to Other Methods of Adjudication ................24

D.     The Court Should Appoint Robbins Geller as Class Counsel .............................25

IV.     CONCLUSION........................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Prods. Inc. v. Windsor*,
  521 U.S. 591 (1997) ..................................................................................................11, 13

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) ................................................................................................7, 13, 15

*Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  955 F.3d 254 (2d Cir. 2020) ...................................................................................7, 15, 16

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ......................................................................................................14, 15

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) .......................................................................8, 9, 16, 18

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ....................................................................... *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. Aug. 20, 2015) ...........................................................12, 18, 20, 23

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ......................................................................................................22, 23

*Consol. Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) ..............................................................................................8

*Eisen v. Carlisle & Jacquelin*,
  391 F.2d 555 (2d Cir. 1968) ..............................................................................................6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ................................................................................................13, 14, 15

*Glauser v. EVCI Career Colleges Holding Corp.*,
  236 F.R.D. 184 (S.D.N.Y. 2006) ......................................................................................11

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968) ..............................................................................................6

*Gruber v. Gilbertson*,
  No. 16cv9727, 2019 WL 4439415
  (S.D.N.Y. Sept. 17, 2019) ...............................................................................3, 7, 9, 13

**Page**

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).................................................................................................14, 15

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ..............................................................................18

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
    281 F.R.D. 134 (S.D.N.Y. 2012) .........................................................................10, 11

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) ................................................................................10

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    No. 17 Civ. 1580 (LGS), 2020 WL 1329354
    (S.D.N.Y. Mar. 23, 2020) ................................................................................. *passim*

*In re Deutsche Bank AG Sec. Litig.*,
    328 F.R.D. 71 (S.D.N.Y. 2018) ................................................................................13

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992)......................................................................................11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).............................................................................9, 11, 12

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
    No. 12-CV-2548 (VSB), 2017 WL 1273963
    (S.D.N.Y. Mar. 31, 2017) ........................................................................7, 9, 11, 13

*In re JPMorgan Chase & Co. Sec. Litig.*,
    No. 12 Civ. 03852 (GBD), 2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)..........................23

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) ..................................................................................9

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017).......................................................................12, 13, 16, 20

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ................................................................................24

*In re Signet Jewelers Ltd. Sec. Litig.*,
    No. 16 Civ. 6728(CM)(RWL), 2019 WL 3001084
    (S.D.N.Y. July 10, 2019) .................................................................................. *passim*

*In re SunEdison, Inc. Sec. Litig.*,
    329 F.R.D. 124 (S.D.N.Y. 2019) ...........................................................................8, 14

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   No. 15cv1249, 2017 WL 2062985
   (S.D.N.Y. May 15, 2017) ........................................................................................7, 8, 9, 24

*In re Vivendi Universal, S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) .............................................................................................8, 10

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ...........................................................................17, 18, 19

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
   311 F.R.D. 373 (S.D.N.Y. 2015) ...............................................................................................24

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ........................................................................16, 19, 21, 22

*McIntire v. China MediaExpress Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014) ..............................................................................17, 21, 22

*Micholle v. Ophthotech Corp.*,
   No. 17-CV-1758 (VSB), 2018 WL 1307285
   (S.D.N.Y. Mar. 13, 2018) ........................................................................................5, 11, 12

*Micholle v. Ophthotech Corp.*,
   No. 17-CV-210 (VSB), 2019 WL 4464802
   (S.D.N.Y. Sept. 17, 2019) ..........................................................................................1, 4, 6

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   327 F.R.D. 38 (S.D.N.Y. 2018) ...................................................................................................7, 20

*Pub. Emps.' Ret. Sys. of Mississippi v. Goldman Sachs Grp., Inc.*,
   280 F.R.D. 130 (S.D.N.Y. 2012) ..............................................................................................25

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) ..................................................................................................22, 24

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd sub nom.*, *Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ..................................................................................16, 17, 21, 22

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015) .......................................................................................................23

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) .........................................................................................................8

**Page**

*Villella v. Chem. & Mining Co. of Chile Inc.*,
   333 F.R.D. 39 (S.D.N.Y. 2019) ............................................................................21, 22

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018) ........................13, 15, 16, 19

*Wilson v. LSB Indus., Inc.*,
   No. 15 Civ. 7614 (RA), 2018 WL 3913115
   (S.D.N.Y. Aug. 13, 2018) ......................................................................................23

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78t(a) ........................................................................................1, 6, 7, 13, 14
   §78t(a) ............................................................................................1, 6, 7, 14
   §78j(b) ................................................................................................1, 6, 7
   §78t(a) ................................................................................................1, 6, 7

17 C.F.R.
   §239.13 ......................................................................................................19
   §240.10b-5 ..................................................................................................1

Federal Rules of Civil Procedure
   Rule 23 ......................................................................................6, 7, 11, 12
   Rule 23(a) ..............................................................................2, 7, 13, 25
   Rule 23(a)(1) ..............................................................................................7
   Rule 23(a)(2) ..............................................................................................8
   Rule 23(a)(3) ..............................................................................................9
   Rule 23(a)(4) ......................................................................................10, 12
   Rule 23(a), (b)(3), and (g) ....................................................................1, 25
   Rule 23(b) ..................................................................................................7
   Rule 23(b)(3) ......................................................................................*passim*
   Rule 23(b)(3)(A)-(D) ................................................................................24
   Rule 23(g) ................................................................................................25
   Rule 23(g)(1) ............................................................................................25
   Rule 23(g)(1)(A)(i)-(iv) ............................................................................25

## SECONDARY AUTHORITIES

*Shelf Registration*, Securities Act Release No. 6499, 1983 WL 408321
   (Nov. 17, 1983) ........................................................................................19

Lead Plaintiff Sheet Metal Workers' Pension Plan of Southern California, Arizona, and Nevada ("Lead Plaintiff" or the "Pension Fund") respectfully submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 23(a), (b)(3), and (g), for an Order: (i) certifying this case as a class action; (ii) appointing Lead Plaintiff as Class Representative; and (iii) designating Lead Counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.

## I.   INTRODUCTION

This is a federal securities action alleging that Ophthotech Corporation ("Ophthotech" or the "Company") and its co-founders David R. Guyer, M.D. and Samir C. Patel, M.D. (collectively, "Defendants") violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, "by making materially false and misleading statements regarding the parameters . . . of clinical studies for Fovista, a new drug developed by Ophthotech to treat macular degeneration." *Micholle v. Ophthotech Corp.*, No. 17-CV-210 (VSB), 2019 WL 4464802, at *1 (S.D.N.Y. Sept. 17, 2019).

Lead Plaintiff seeks certification on behalf of a Class consisting of:

> All purchasers of the common stock of Ophthotech between March 2, 2015 and December 12, 2016, inclusive (the "Class Period"), who were damaged thereby. Excluded from the Class are Defendants, members of the immediate families of each Defendant, the Company and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

"'Courts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification.'" *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020).[1] This case is no exception.

---

[1]   Internal citations, alterations and footnotes are omitted, and all emphasis in quotations is added, unless otherwise noted.

All of the prerequisites for class certification under Rule 23(a) – numerosity, commonality, typicality, and adequacy – are met here. *First*, given the number of shares traded during the Class Period, the Class easily consists of more than 40 members and numerosity is satisfied. *Second*, because the Class' claims arise from the same misstatements and omissions and rely on the same theories of liability, questions of law and fact are common to the Class. *Third*, Lead Plaintiff's claims are typical of those of the Class because they share the same factual and legal underpinnings. *Fourth*, Lead Plaintiff, an institutional investor, is committed to prosecuting this action vigorously and in the best interests of the Class, and has retained one of the most successful and experienced securities class action law firms in the country. These issues are largely, if not entirely, undisputed.

Additionally, common questions of law and fact predominate over individual ones, and class treatment is superior to individual adjudication. Issues of materiality, loss causation and reliance all present common questions, with reliance presumed because Ophthotech stock traded in an efficient market during the Class Period, as Lead Plaintiff's financial expert, Dr. Steven P. Feinstein, has shown. And Dr. Feinstein has demonstrated that damages may be calculated on a class-wide basis, using a common methodology.

Accordingly, class certification is appropriate in this case, and Lead Plaintiff respectfully requests that the Court grant this motion in its entirety.

## II.    STATEMENT OF FACTS COMMON TO THE CLASS

Ophthotech (now known as IVERIC bio, Inc.), was a clinical-stage biopharmaceutical company focused on developing a drug known as Fovista, intended to treat the eye disease wet age-

related macular degeneration ("wet AMD").  ¶¶1-3, 28-31.[2]  Fovista was designed to be used in combination with existing wet AMD drugs, including the drug Lucentis.  ¶¶3, 31-32.

Prior to the Class Period, Ophthotech had completed phase 1 and phase 2 clinical trials evaluating Fovista in combination with Lucentis, and had initiated phase 3 clinical trials, as required to secure approval of Fovista by the U.S. Food and Drug Administration.  ¶32.  The Company announced purportedly "breakthrough" and "extraordinary" results from its "Phase 2b Trial" in June 2012, launched three separate "Phase 3 Trials" beginning in August 2013, and subsequently went public, raising hundreds of millions of dollars from investors.  ¶¶4, 32-33, 36, 40-41, 43.  Since Ophthotech's ability to commercialize Fovista and become a profitable company was dependent upon regulatory approval, investors were focused on the Phase 3 Trials' prospects for success.  ¶49.

The CAC alleges that during the Class Period, Defendants falsely represented that Ophthotech had "*made no meaningful changes* to the inclusion and exclusion criteria in the[] Phase 3 clinical trials from those [] used in [the] Phase 2b clinical trial," when in truth, Defendants had made a significant change.  ¶¶6, 53, 63, 100.  Ophthotech's Phase 2b Trial had categorized patients by lesion subtype and excluded patients with a particular type of lesion, called "pure occult," which accounts for approximately 40% of wet AMD cases.  ¶54.  By contrast, eligibility for the Phase 3 Trials was based upon the presence of subretinal hyper-reflective material ("SHRM") – a type of abnormal tissue observable in some wet AMD patients.  ¶¶6, 55.

This change in enrollment criteria was facilitated by advances in retinal imaging technology, whereby spectral domain optical coherence tomography ("SD-OCT") was replacing fluorescein angiography ("FA") as the standard imaging technology.  ¶57.  While FA and SD-OCT are both

---

[2]  "¶" refers to paragraphs of the Consolidated Amended Complaint (the "CAC"), ECF No. 63, the allegations of which are "accept[ed] . . . as true" for purposes of this motion. *Gruber v. Gilbertson*, No. 16cv9727, 2019 WL 4439415, at *1 (S.D.N.Y. Sept. 17, 2019).

capable of detecting lesion characteristics associated with classic and occult subtypes, the presence of SHRM can only be detected using SD-OCT.  ¶¶57, 65, 102.

Although SHRM was a newly-discovered phenomenon that had not been thoroughly studied and was not fully understood (¶¶7, 56), Defendants represented that SHRM was "the same as" the "classic" lesion subtype, insisted that "the same group of patients" was eligible for inclusion in the Phase 3 Trials as in the Phase 2b Trial (¶115) and a "similar" patient population would be enrolled (¶63), and denied that patients with occult lesions were eligible for the Phase 3 Trials.  ¶104.

Critically, however, SHRM can be present in patients whose lesions have either classic or occult components – including patients with pure occult lesions.  ¶¶8, 58.  Therefore, this change to the enrollment criteria was significant because it meant that the estimated 40% of wet AMD patients with pure occult lesions – who had been excluded from the Phase 2b Trial – were potentially eligible for inclusion in the Phase 3 Trials.  *Id.*  Indeed, Ophthotech's 2014 and 2015 Forms 10-K estimated that SHRM was present in approximately 77% of wet AMD patients, meaning that the 23% of patients lacking SHRM were ineligible for the Phase 3 Trials, as compared to the 40% of wet AMD patients with pure occult lesions who were ineligible for the Phase 2b Trial.  *See Ophthotech*, 2019 WL 4464802, at *12.  Thus, "by Defendants' own admission," there was "*at least* a 17% overlap between lesions classified as 'pure occult' and those that demonstrate[d] the presence of SHRM[,] . . . suggest[ing] that the pool of eligible participants did in fact change between Phase 2b and Phase 3 of the Fovista clinical trials[.]"  *Id.*

By making a significant change to the enrollment criteria for the Phase 3 Trials from the criteria used in the Phase 2b Trial, Defendants materially increased the risk that the apparently favorable results of the Phase 2b Trial would not be replicated in the Phase 3 Trials.  ¶¶9, 59.  Indeed, Defendants were on notice of this risk because when images of patients' lesions were

examined at the end of Ophthotech's phase 1 clinical trial, the occult components of the lesions appeared to be unaffected by treatment with Fovista.  ¶¶60, 140.

Defendants, however, failed to adequately disclose this increased risk to investors, and instead repeatedly emphasized that the enrollment criteria for the Phase 3 Trials were essentially identical to the enrollment criteria for the Phase 2b Trial.  *See, e.g.*, ¶¶63, 76, 82, 86, 90, 108, 115.  Defendants also misrepresented that they had only "modified the *methodology* used to determine a patient's eligibility" for the Phase 3 Trials by utilizing SD-OCT imaging, in order to "properly classify [lesion] characteristics . . . in an accurate and standardized manner" – when in fact, they had modified the *enrollment criteria* by requiring only the presence of SHRM.  ¶¶9, 63, 65, 100, 102.

On December 12, 2016, Ophthotech stunned investors by announcing the results of the first two Phase 3 Trials and disclosing that "*[n]o benefit [was] observed* upon [the] addition of Fovista® to monthly Lucentis® regimen for the treatment of wet [AMD.]" ¶¶11, 121, 149.  In response, the price of Ophthotech common stock plummeted approximately *86%*, from a closing price of $38.77 per share on Friday, December 9, 2016, to close at $5.29 per share on Monday, December 12, 2016, causing significant financial losses for Lead Plaintiff and other Class members.  ¶¶11, 123, 149.

This lawsuit, brought on behalf of purchasers of Ophthotech common stock during the Class Period, followed.  On March 13, 2018, the Court appointed the Pension Fund to direct the prosecution of this case, and designated its counsel, Robbins Geller, as Lead Counsel.  ECF No. 56; *Micholle v. Ophthotech Corp.*, No. 17-CV-1758 (VSB), 2018 WL 1307285 (S.D.N.Y. Mar. 13, 2018).  Lead Plaintiff filed the CAC on June 4, 2018 (ECF No. 63), which Defendants then moved to dismiss.  *See* ECF Nos. 69-71.

On September 17, 2019, the Court denied the motion to dismiss, sustaining the majority of the CAC's allegations. ECF No. 89; *Ophthotech*, 2019 WL 4464802, at *1.[3] Among other things, the Court held that the CAC "satisfactorily allege[d] that Defendants' comparisons between the Phase 2b and Phase 3 enrollment criteria amount[ed] to actionable misrepresentations" (*id*. at *13); that the CAC's factual allegations were "sufficient to draw the requisite 'strong inference' of scienter" (*id*. at *18); and that the CAC "satisfactorily allege[d] that the risk concealed by Defendants' misleading statements regarding the enrollment criteria for the Phase 3 Trial materialized, thereby causing Plaintiff's loss." *Id*.

Since then, Lead Plaintiff has served and responded to discovery requests; conferred with Defendants to negotiate the parameters of discovery; reviewed documents produced by Defendants to-date; and pursued third-party discovery. In accordance with the Case Management Plan and Scheduling Order negotiated by the parties and entered by the Court on May 12, 2020 (ECF No. 100), Lead Plaintiff now respectfully submits this motion for class certification.

## III.   ARGUMENT

### A.   Applicable Legal Standards for Class Certification

For decades, "[t]he Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions[,]" and to err "'in favor'" of granting class certification. *Chicago Bridge & Iron*, 2020 WL 1329354, at *2 (citing *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 563 (2d Cir. 1968); *Green v. Wolf Corp*., 406 F.2d 291, 298 (2d Cir. 1968)). This is particularly true with respect to "'claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act[,] [which] are especially amenable to class

---

[3]   While the Court held that Defendants' "statements related to the Phase 3 Trial [were] sufficient to support a securities fraud claim," it found that certain alleged misstatements "related to the Phase 2(b) Trial [were] not actionable[.]" *Id*. at *7.

certification.'" *Id.*; *see also Gruber*, 2019 WL 4439415, at *2 ("'in light of the importance of the class action device in securities fraud suits, the Rule 23 factors are to be construed liberally'").

To obtain class certification, a plaintiff need only show by a preponderance of the evidence that the proposed class meets all of the prerequisites of Rule 23(a) and satisfies one subsection of Rule 23(b). *See, e.g.*, *In re J.P. Morgan Stable Value Fund ERISA Litig*., No. 12-CV-2548 (VSB), 2017 WL 1273963, at *5 (S.D.N.Y. Mar. 31, 2017). Rule 23(a)'s prerequisites are "numerosity, commonality, typicality, and adequacy of representation," while Rule 23(b)(3) – the subsection under which certification is sought here – requires that common issues predominate over individual ones "'and that a class action is superior to other available methods'" of adjudication. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013).

In determining whether a class should be certified, the Court's analysis should be "'rigorous'"; however, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 465-66; *Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc*., 955 F.3d 254, 268 (2d Cir. 2020) (same); *see also Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 43 (S.D.N.Y. 2018) ("a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement."). "[T]he question before the Court is whether [a] [p]laintiff meets Rule 23's requirements, not whether [the] [p]laintiff will prevail on the merits." *In re Signet Jewelers Ltd. Sec. Litig*., No. 16 Civ. 6728(CM)(RWL), 2019 WL 3001084, at *7 (S.D.N.Y. July 10, 2019). Here, the proposed Class meets all of the applicable requirements of Rule 23.

**B.    The Proposed Class Satisfies the Requirements of Rule 23(a)**

**1.    The Class Is so Numerous that Joinder Is Impracticable**

Numerosity requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'"Impracticable" simply means difficult or inconvenient, not impossible.'" *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15cv1249, 2017 WL 2062985,

at *2 (S.D.N.Y. May 15, 2017). "In the Second Circuit, 'numerosity is presumed at a level of 40 members.'" *Id*. (quoting *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). Moreover, in securities cases involving "'publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.'" *Signet*, 2019 WL 3001084, at *8 (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007)). Evidence of exact class size is not required. *See In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 138 (S.D.N.Y. 2019).

The Class in this case easily exceeds 40 members. Ophthotech had more than 34 million shares of common stock outstanding during the Class Period, with an average of 649,771 shares traded daily on the NASDAQ and over 400 institutional shareholders. *See* Feinstein Rept., ¶¶30 n.23, 51, 61.[4] Under these circumstances, joinder of all Class members would be difficult and inconvenient. Thus, numerosity is established. *Virtus*, 2017 WL 2062985, at *2 (numerosity established where the daily trading volume averaged approximately 65,000 shares and the proposed class was likely comprised of thousands of geographically dispersed class members); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 153, 156 (S.D.N.Y. 2012) (finding numerosity where company had 23 million ADRs outstanding and between 71 and 82 institutional investors).

## 2.      Common Questions of Law and Fact Exist

Commonality requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[A] common question is one where 'the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). "[M]inor variations in the class

---

[4]   References to "Feinstein Rept." are to the Report on Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, dated June 12, 2020, attached as Exhibit A to the Declaration of Erin W. Boardman, filed concurrently herewith.

members' positions will not suffice to defeat certification," *Billhofer*, 281 F.R.D. at 156, and identifying "'[e]ven a single common legal or factual question will suffice.'" *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009). The commonality requirement, therefore, "has been described as a 'low hurdle.'" *Gruber*, 2019 WL 4439415, at *3.

The common questions of law and fact present here include whether Defendants misrepresented or omitted material facts about Ophthotech's business, whether Defendants acted with scienter, whether the price of Ophthotech common stock was artificially inflated during the Class Period, and to what extent the members of the Class have sustained damages and the proper measure of damages. ¶155. Moreover, the answers to these common questions are susceptible to generalized class-wide proof. *See, e.g.*, *Chicago Bridge & Iron*, 2020 WL 1329354, at *11 (finding commonality satisfied where plaintiffs "allege[d] the same injury and claims resulting [from] common misrepresentations and omissions" and were "impacted by disclosures affecting equally all market participants who transacted [in defendant's] stock"); *Virtus*, 2017 WL 2062985, at *2 (commonality is "satisfied where there are common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages"). Thus, the commonality requirement is satisfied in this case, "as is typical of most securities fraud putative class actions[.]" *Signet*, 2019 WL 3001084, at *8.

### 3.      Lead Plaintiff's Claims are Typical of Those of the Class

Typicality requires that "the claims or defenses of the representative parties are typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality "'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *J.P. Morgan Stable Value Fund*, 2017 WL 1273963, at *7; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (same).

"This standard is 'not demanding,' as 'the claims only need to share the same essential characteristics, and need not be identical.'" *Chicago Bridge & Iron*, 2020 WL 1329354, at *11.

"'In a securities class action, when "plaintiffs will necessarily seek to develop facts relating to the dissemination of allegedly false or misleading statements underlying their claims," the claims and nature of evidence "are generally considered sufficient to satisfy the typicality requirement."'" *Signet*, 2019 WL 3001084, at *8 (quoting *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig*., 281 F.R.D. 134, 139 (S.D.N.Y. 2012); *Vivendi*, 242 F.R.D. at 85).  In this case, "all potential class members were allegedly injured by the same alleged misrepresentations and omissions regarding" Ophthotech's Phase 3 Trials, "and all claim securities law violations based on the same . . . nucleus of facts." *Chicago Bridge & Iron*, 2020 WL 1329354, at *11.  Because the claims alleged, by their very nature, arise out of Defendants' misconduct, the evidence necessary to prove these claims is not only uniform, but also identical.

Moreover, the Pension Fund, like the other Class members, purchased Ophthotech common stock during the Class Period at artificially inflated prices, after Defendants disseminated certain of the misstatements at issue (*see* ECF No. 33-1; *see also* ¶¶90, 94, 100, 102, 104, 108, 115), and suffered losses when the truth emerged.  ¶¶147-50.  Accordingly, because the same course of conduct injured Lead Plaintiff and all other Class members, and the evidence required to prove such claims will not differ, Lead Plaintiff's claims are typical of those of the Class.

### 4.    Lead Plaintiff Will Fairly and Adequately Represent the Class

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This requirement is satisfied where, as here: (1) the class representative's interest is to vigorously pursue the claims of the class and is not "'antagonistic to the interests of other class members'"; and (2) the proposed class counsel is "'qualified, experienced and able to conduct the litigation.'" *In re Barrick Gold Sec. Litig*., 314 F.R.D. 91, 99

(S.D.N.Y. 2016).  "The focus of the adequacy inquiry is on determining whether there are 'conflicts of interest between named parties and the class they seek to represent.'"  *J.P. Morgan Stable Value Fund*, 2017 WL 1273963, at *9 (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).  "To preclude certification[,]" any "conflict must be 'fundamental.'"  *Id.* (quoting *Flag Telecom*, 574 F.3d at 35).

Here, "[a]s discussed with respect to the typicality requirement, the interests of the proposed [C]lass [R]epresentative[] are not antagonistic to the interests of the proposed [C]lass members."  *Bank of Am.*, 281 F.R.D. at 140.  Indeed, Lead Plaintiff and other Class members "share a common interest in showing that [Defendants] violated . . . [the] securities laws" and "wish to obtain the highest possible recovery" for the claims alleged.  *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).

Additionally, Lead Plaintiff, a multiemployer defined benefit plan, "is precisely the type of sophisticated institutional investor[] that Congress" and courts in this District "have recognized as being ideally suited to control this type of securities class action litigation."  *Glauser v. EVCI Career Colleges Holding Corp.*, 236 F.R.D. 184, 188 (S.D.N.Y. 2006); *see also Ophthotech*, 2018 WL 1307285, at *10 (concluding in the lead plaintiff context that the Pension Fund "satisf[ied] the adequacy and typicality requirements of Rule 23").

Since this Court appointed the Pension Fund as Lead Plaintiff, it has demonstrated its willingness and ability to serve as an adequate Class Representative.  Among other things, the Pension Fund has: (i) supervised and monitored the progress of the litigation; (ii) participated in discussions with Lead Counsel concerning case developments; (iii) reviewed Court filings; and (iv) searched for, collected, and produced documents responsive to Defendants' discovery requests.  *See* Boardman Decl. Ex. B ¶5.  The Pension Fund understands its duty to the Class, will make itself

- 11 -

available for depositions, hearings and trial, and is committed to vigorously prosecuting this action to maximize recovery for all Class members. *See id.*, ¶¶4-5.

Lead Plaintiff has ensured that the interests of the Class will continue to be protected by retaining counsel who are "'qualified, experienced and able to conduct the litigation.'" *Flag Telecom*, 574 F.3d at 35. "Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. Aug. 20, 2015); *see also Ophthotech*, 2018 WL 1307285, at *10 (finding that "Robbins Geller . . . is experienced and qualified, has represented plaintiffs in multiple other securities class action litigations, and has the ability to conduct the litigation effectively"). Among other things, Robbins Geller has drafted a detailed amended complaint, opposed Defendants' motion to dismiss, and pursued comprehensive discovery from Defendants and third parties. Robbins Geller has diligently prosecuted the Class members' claims to-date, and is committed to doing so for as long as it takes to secure a successful outcome for the Class.

Lead Plaintiff is well-suited to represent the Class, and was injured by Defendants' fraud like the rest of the Class members. Lead Plaintiff and Lead Counsel are willing and able to prosecute this action on behalf of absent Class members and "will fairly and adequately protect" their interests. Fed. R. Civ. P. 23(a)(4). Therefore, adequacy is established.[5]

---

[5]   The proposed Class also meets "the 'implied' Rule 23 requirement of 'ascertainability'" because "it is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 257 (2d Cir. 2017). "The proposed Class definition clearly delineates the Class'[] boundaries by the dates of investors' transactions" in Ophthotech stock, and "[a]scertaining the members of the Class will be easily administrable by reference to investor records." *Signet*, 2019 WL 3001084, at *9.

C.    **The Proposed Class Satisfies the Requirements of Rule 23(b)(3)**

In addition to meeting the requirements of Rule 23(a), this case also satisfies Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

1.    **Common Questions of Law and Fact Predominate**

"Predominance is a test readily met in certain cases alleging . . . securities fraud[.]"  *Amchem Prods.*, 521 U.S. at 625.  The "'predominance' requirement is satisfied if: (1) resolution of any material 'legal or factual questions can be achieved through generalized proof,' and (2) 'these common issues are more substantial than the issues subject only to individualized proof.'"  *Petrobras*, 862 F.3d at 270; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018).  "'While predominance requires a more rigorous showing than does commonality or typicality, it does not require a plaintiff to show that there are no individual issues.'"  *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 85 (S.D.N.Y. 2018); *accord Amgen*, 568 U.S. at 469 (common issues must *predominate*).

The analysis of whether common questions predominate "'begins . . . with the elements of the underlying cause of action.'"  *J.P. Morgan Stable Value Fund*, 2017 WL 1273963, at *13 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*")).[6] In securities fraud cases such as this, "materiality, falsity, and loss causation are considered 'common questions.'"  *Gruber*, 2019 WL 4439415, at *6; *see also Amgen*, 568 U.S. at 467, 475

---

[6]  The elements of Plaintiff's claims under Section 10(b) and Rule 10b-5 of the Exchange Act are: "'"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."'"  *Halliburton I*, 563 U.S. at 810.

(falsity and materiality present common questions).  Indeed, the Supreme Court has held that a plaintiff is not required to "show loss causation as a condition of obtaining class certification" because it is a common question.  *Halliburton I*, 563 U.S. at 813.  Scienter is likewise a common question because Defendants' state of mind did not differ with respect to individual Class members.  *See, e.g.*, *SunEdison*, 329 F.R.D. at 146-47 (scienter presented a common question).  Therefore, the predominance inquiry "often turns on the element of reliance."  *Halliburton I*, 563 U.S. at 810.

Here, Lead Plaintiff and the Class are entitled to a presumption of Class-wide reliance under the fraud-on-the-market theory set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  Damages will also be determined on a Class-wide basis using the same formula and measure of artificial inflation attributable to Defendants' conduct for all Class members.[7]  Accordingly, the predominance requirement is satisfied.

a.     **Lead Plaintiff Is Entitled to the Fraud-on-the-Market Presumption of Reliance**

The fraud-on-the-market theory "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations'" and that investors in such markets transact "'in reliance on the integrity of that price[.]'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*") (quoting *Basic*, 485 U.S. at 246-47).  The Supreme Court held in *Basic*, and reaffirmed in *Halliburton II*, that investor-classes may therefore "satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market

---

[7]   Additionally, because the elements of a Section 20(a) claim turn on the individual defendants' liability as control persons, those questions are common to the Class as well.

price may be considered to have done so in reliance on the misrepresentation." *Halliburton II*, 573 U.S. at 283-84.

To invoke the presumption, a plaintiff must show that: (1) "the alleged misrepresentations were publicly known"; (2) "the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed'"; and (3) "the stock traded in an efficient market[.]" *Halliburton I*, 563 U.S. at 811; *Goldman Sachs Group, Inc.*, 955 F.3d at 270 (same).[8]  Each of these prerequisites is satisfied here.  First, the alleged misrepresentations were public, as they were disseminated to investors via Ophthotech's SEC filings, and during earnings calls and investor conferences. *See, e.g.*, ¶¶63, 90, 104.  Second, Lead Plaintiff, like other members of the proposed Class, purchased Ophthotech common stock between the time the misrepresentations at issue in this case were made and the end of the Class Period.  *See* ECF No. 33-1 (showing purchases on December 22, 2015 and April 14, July 1, and December 5, 2016).  Third, as detailed below and in the accompanying Feinstein Report, the market for Ophthotech common stock was efficient throughout the Class Period.  Feinstein Rept., ¶¶17, 151.

> **b.    Ophthotech Stock Traded in an Efficient Market During the Class Period**

"An efficient market is 'one in which the prices of the stock incorporate most public information rapidly.'" *Waggoner*, 875 F.3d at 94.  Although the Second Circuit has "declined to adopt a particular test for market efficiency," it has recognized that courts in this District "regularly consider" the following factors:

> (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded

---

[8]  "Even though materiality is a prerequisite for invoking the *Basic* presumption, [the Supreme Court has] held that it should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3)." *Halliburton II*, 573 U.S. at 282 (citing *Amgen*, 568 U.S. at 466-67).

in the stock, (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price.

*Id.* (citing factors from *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)). As the Second Circuit further recognizes, courts in this District "often consider" the following additional factors: "'(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ("the float")."' *Id.* at 94-95 (quoting *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)).

The Second Circuit has instructed that the *Cammer* and *Krogman* factors should be used as analytical tools, not as a checklist, and should be analyzed "holistic[ally]" "based on the totality of the evidence presented." *Petrobras*, 862 F.3d at 277. Further, "the burden required to establish market efficiency 'is not an onerous one.'" *Waggone*r, 875 F.3d at 97.

Indeed, an analysis of the *Cammer* and *Krogman* factors is arguably unnecessary where, as here, "a security is listed on the . . . NASDAQ, or a similar national market," because many courts find that "the market for [such a] security is presumed to be efficient.'" *Billhofer*, 281 F.R.D. at 159 (finding market efficiency where company's ADRs traded on the NASDAQ); *see also Goldman Sachs Grp.*, 955 F.3d at 261 (describing the NASDAQ as a "theoretically efficient market[]"); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016), *aff'd sub nom.*, *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ("most courts in this Circuit agree that" [a] listing" on the NYSE or NASDAQ "is a good indicator of efficiency"). Nonetheless, a holistic consideration of all the *Cammer* and *Krogman* factors overwhelmingly supports a finding that the market for Ophthotech common stock was efficient, entitling Lead Plaintiff and the Class to rely on the fraud-on-the-market presumption of reliance.

(1)   ***Cammer* Factor 1: Ophthotech Stock Experienced a High Weekly Trading Volume**

High trading volume "suggests efficiency 'because it implies significant investor interest in the company . . . [which], in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.'" *Strougo*, 312 F.R.D. at 316. "Average weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013).

The average weekly trading volume of Ophthotech common stock during the Class Period was 9.22% of outstanding shares – well above this threshold – justifying a strong presumption of market efficiency. Feinstein Rept., ¶52. Indeed, there was significant investor interest in Ophthotech during the Class Period, as an average on 3.25 million shares traded weekly. *Id.*

(2)   ***Cammer* Factor 2: Numerous Securities Analysts and Media Outlets Covered and Reported on Ophthotech**

Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market." *Winstar*, 290 F.R.D. at 446. "This factor is commonly met where multiple large brokerage firms produce . . . reports on the financial condition of a company . . . ." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014). According to economic literature, coverage by just one or two analysts strengthens the presumption of efficiency. Feinstein Rept., ¶57. During the Class Period, analysts from at least 14 different firms followed Ophthotech, including major financial firms such as Barclays, Citigroup, Goldman Sachs, JPMorgan, and Morgan Stanley. *Id.*, ¶¶55-56. The extensive analyst coverage of Ophthotech easily satisfies *Cammer* factor two and supports a finding of market efficiency. *See Winstar*, 290 F.R.D. at 446 (finding market efficient with three analysts).

Courts also recognize that widespread media coverage is indicative of market efficiency. *See Carpenters*, 310 F.R.D. at 92 ("regular press coverage throughout the Class Period" weighed in favor of finding market efficiency); *Billhofer*, 281 F.R.D. at 153-54 (publication of over two dozen press releases and articles supported finding of market efficiency). Here, at least 392 articles about Ophthotech were published during the Class Period. Feinstein Rept., ¶63. In conjunction with the analyst coverage, Ophthotech's media coverage provides further support for the efficiency of the market for Ophthotech common stock.

### (3)   *Cammer* Factor 3: The Presence of Market Makers Is Indicative of Market Efficiency

Market makers are financial intermediaries who trade in a particular security, standing ready to buy and sell with individual investors, institutions, and other market makers. Feinstein Rept., ¶66. "Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level." *Winstar*, 290 F.R.D. at 446. "Courts in this Circuit have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency." *Carpenters*, 310 F.R.D. at 92. During the Class Period, there were at least 43 market makers for Ophthotech common stock – more than enough to support a finding of market efficiency. Feinstein Rept., ¶67.

Additionally, over 400 major institutions – those with investment discretion over $100 million or more in assets – owned Ophthotech stock during the Class Period. Feinstein Rept., ¶¶60-61. Such high institutional ownership has also been considered indicative of market efficiency. *See In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (finding that institutional investors could "easily buy and sell" a security and "likely acted as arbitrageurs and facilitated the efficiency of the market").

(4)     *Cammer* Factor 4: Ophthotech was Eligible to
File a Form S-3 Registration Statement

"The ability to file this form" is evidence of market efficiency because it "indicates that the company is easily able to issue new securities." *Winstar*, 290 F.R.D. at 447.  Additionally, Form S-3 eligibility "recognize[s] the applicability of the efficient market theory to [eligible filers]," "whose corporate information" is "constantly digested and synthesized by financial analysts" and "broadly disseminated on a timely basis by the financial press and other participants in the marketplace." *Shelf Registration*, Securities Act Release No. 6499, 1983 WL 408321, at *5 (Nov. 17, 1983); *accord Cammer*, 711 F. Supp. at 1284.  To be eligible to file a Form S-3 registration statement, a company must have filed SEC reports for twelve consecutive months, and have a public float of at least $75 million.  *See* 17 C.F.R. §239.13; *see also* Feinstein Rept., ¶72.  Ophthotech satisfied the conditions for S-3 registration eligibility throughout the Class Period.  Feinstein Rept., ¶74. Ophthotech made periodic SEC filings at all relevant times, and its average float of $1.63 billion was more than 20 times greater than the threshold requirement for S-3 registration.  *Id*.  Accordingly, this factor militates in favor of market efficiency.

(5)     *Cammer* Factor 5: Ophthotech Stock Reacted to
Unexpected Company-Specific Information,
Demonstrating a Cause-and-Effect Relationship

The fifth *Cammer* factor allows, but does not require, a plaintiff to submit "direct evidence" demonstrating a "'cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.'"  *Waggoner*, 875 F.3d at 94.  The Second Circuit has held that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies" – particularly where the other, "indirect" *Cammer* and *Krogman* factors provide compelling evidence of market efficiency.  *Id*. at 96-98. Here, the first four *Cammer* factors, and all of the *Krogman* factors discussed below, support market

efficiency, obviating the Court's need to analyze the fifth Cammer factor. *See Pirnik*, 327 F.R.D. at 45 n.3 ("As Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact."); *Carpenters*, 310 F.R.D. at 86 ("In the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it.").

Nonetheless, Dr. Feinstein's event study analysis provides compelling evidence of a cause-and-effect relationship between the dissemination of unexpected Ophthotech-related news and movement in the Company's stock price. *See* Feinstein Rept., ¶¶89-148. An event study measures how much a security price rises or falls in response to new, company-specific information. Feinstein Rept., ¶91. "'[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship.'" *Petrobras*, 862 F.3d at 278.

Dr. Feinstein's event study identified and analyzed four dates on which "company-specific information was released that [was] new, unexpected, and . . . potentially . . . on balance of such import as to reasonably be expected to elicit a stock price reaction over the threshold for statistical significance." Feinstein Rept., ¶96; *see also id.*, ¶99. Using statistical analysis, Dr. Feinstein isolated the portion of Ophthotech stock movements that could not be attributed to market or sector factors, *i.e.*, the "residual return," and determined whether the residual return was statistically significant. *Id.*, ¶91; *see also id.*, ¶¶126-39. A statistically significant residual return indicates that the security price movement was caused by new, company-specific information. *Id.*, ¶92.

Dr. Feinstein's event study shows that, "for all four of the events tested, there was a strong statistically significant price reaction to Company-specific news." *Id.*, ¶148; *see also id.*, ¶¶140-47. Dr. Feinstein concluded that the event study results "demonstrate[d] a cause-and-effect relationship

between new, unexpected, valuation-relevant information and reactions in the market price of Ophthotech stock." *Id.*, ¶148.  Thus, the fifth *Cammer* factor is satisfied and provides further evidence of market efficiency.

### (6) The *Krogman* Factors Also Support a Finding of Market Efficiency

All three *Krogman* factors – market capitalization, bid-ask spread, and public float – likewise support a finding of market efficiency.  *See* Feinstein Rept., ¶¶76-85.

*First*, Ophthotech's large market capitalization – *i.e.*, the total value of all outstanding shares – supports market efficiency because "investors tend to be more interested in companies with higher market capitalizations, thus leading to more efficiency." *Strougo*, 312 F.R.D. at 315.  Ophthotech had an average market capitalization of $1.78 billion during the Class Period, placing it in the third decile of U.S. companies by size – meaning that Ophthotech was larger than at least 70% of all other publicly-traded companies in the United States, as measured by market capitalization.  Feinstein Rept., ¶77.  This sizeable market capitalization exceeds the market capitalizations of companies whose securities have been found to be trading in efficient markets.  *See, e.g.*, *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (market capitalization of $1 billion); *McIntire*, 38 F. Supp. 3d at 433 ($292 million to $585 million market capitalization).

*Second*, the bid-ask spread for Ophthotech stock – *i.e.*, the difference between the price at which market makers are offering to buy a security and the price at which they are offering it for sale – was exceedingly narrow.  Feinstein Rept., ¶¶49, 82-85.  "[A] small bid-ask spread indicate[s] that trading in the stock [is] inexpensive, suggesting efficiency." *Strougo*, 312 F.R.D. at 316.  The average bid-ask spread for Ophthotech stock during the Class Period was 0.05%, well below the collective average bid-ask spread of all stocks traded on U.S. exchanges, which was 0.63% during

the Class Period.  Feinstein Rept., ¶84; *see also Villella*, 333 F.R.D. at 54 (finding a 0.06% bid-ask spread narrow).

*Third*, Ophthotech's public float – the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities – averaged $1.63 billion, or 91.4% of shares outstanding. Feinstein Rept., ¶¶48, 79-80.  The large size and high percentage of Ophthotech's float is indicative of market efficiency.  *See Strougo*, 312 F.R.D. at 316-17 ("[t]he percentage of shares available to the public generally bears a direct relationship to efficiency" because when insiders with private information hold large portions of the security, "the price is less likely to reflect only the total of all public information"); *McIntire*, 38 F. Supp. 3d at 433 (finding that float of between 57% and 69% of shares outstanding supported efficiency).

*   *   *

In sum, all of the "indirect" *Cammer* and *Krogman* factors overwhelmingly weigh in favor of a finding that the market for Ophthotech stock was efficient during the Class Period.  Feinstein Rept., ¶149.  And although not required, Lead Plaintiff has also satisfied the fifth *Cammer* factor by providing "direct evidence" of market efficiency.  *Id.*, ¶150.  Accordingly, Lead Plaintiff is entitled to the fraud-on-the-market presumption of reliance in this case, and common questions predominate.

### c. Damages May be Calculated on a Class-Wide Basis Using a Common Methodology

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class'[] asserted theory of injury[.]"  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015).  As the Second Circuit has acknowledged, *Comcast* does not require "a finding that damages are capable of measurement on a classwide basis."  *Id*. at 402. "All that is required at class certification is that 'the plaintiffs must be able to show that their

- 22 -

damages stemmed from the defendant's actions that created the legal liability.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015).

Here, Lead Plaintiff has made the necessary connection and demonstrated that damages can be calculated using a common methodology. Dr. Feinstein explains that valuation tools, including an event study, would be used to assess whether the alleged misrepresentations and omissions caused Ophthotech's stock price to be artificially inflated, and whether corrective disclosures caused the inflation to dissipate. Feinstein Rept., ¶159. An inflation ribbon would be constructed to quantify the artificial inflation in the price of Ophthotech stock resulting from the alleged misrepresentations and omissions. *Id*. Damages per share would be the difference between inflation on the share purchase date and inflation on the share sale date. *Id*. The calculation of damages "would be a mechanical arithmetic exercise, conducted the same way for all Class members[.]" *Id*.

Courts have consistently found that this approach satisfies *Comcast*. *See, e.g.*, *Signet*, 2019 WL 3001084, at *20 (event study satisfied *Comcast* by "provid[ing] a class-wide model for calculating damages arising from [plaintiff's] theory of liability"); *Wilson v. LSB Indus., Inc.*, No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115, at *16-*17 (S.D.N.Y. Aug. 13, 2018) (Dr. Feinstein's "three step method of calculating damages on a per share basis" was sufficient to show "that common questions of law and fact regarding damages will predominate"); *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 03852 (GBD), 2015 WL 10433433, at *7 (S.D.N.Y. Sept. 29, 2015) (accepting Dr. Feinstein's "propos[al] to calculate classwide, per-share damages through an event study analysis"); *Carpenters*, 310 F.R.D. at 99 ("Plaintiffs' model survives the minimal scrutiny required under *Comcast* and Rule 23(b)(3) – their theory of liability matches their theory of damages and individualized damages issues will not predominate."). And although the specific amount of damages may vary among Class members, it is well established that "'the fact that damages may

have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." *Roach*, 778 F.3d at 405.

### 2.  A Class Action Is Superior to Other Methods of Adjudication

"The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." *Virtus*, 2017 WL 2062985, at *6.  In assessing Rule 23(b)(3)'s superiority requirement, courts consider: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)-(D).  "Securities cases 'easily satisfy' [the superiority] requirement, as 'the alternatives are either no recourse for thousands of stockholders' or 'a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'" *Chicago Bridge & Iron*, 2020 WL 1329354, at *11.  This case is no different.

First, the proposed Class consists of a large number of geographically dispersed purchasers of Ophthotech stock whose individual damages likely are too small to make individual litigation economically worthwhile.  *See Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 383 (S.D.N.Y. 2015) (the superiority requirement is met where there is a "risk that, absent class action, certain . . . investors would be unable to adjudicate their claims").  Second, Lead Plaintiff is not aware of any other securities litigation commenced by Class members regarding the alleged fraud. Third, "concentrating the litigation in this forum would promote judicial economy" in light of the Court's familiarity with the subject matter of this action, *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 53 (S.D.N.Y. 2012), while also eliminating "the risk of inconsistent judgments" and enabling the Class to benefit from "the familiarity of the Southern District of New York with securities law."

- 24 -

*Pub. Emps.' Ret. Sys. of Mississippi v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130, 141 (S.D.N.Y. 2012).  Finally, Lead Plaintiff does not foresee any management difficulties that will preclude this action from being maintained as a class action.  Thus, a class action is clearly superior to a multiplicity of individual suits alleging identical claims.

        **D.**      **The Court Should Appoint Robbins Geller as Class Counsel**

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel."  In appointing class counsel, the Court considers counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  As discussed above, Robbins Geller has ably identified, investigated, and vigorously pursued the Class' claims in this action and will continue to do so.  *See* §III.B.4., *supra*.  In detailed briefing related to Defendants' motion to dismiss, Robbins Geller demonstrated its knowledge of the applicable law.  *See* ECF No. 74.  And as its firm résumé confirms, Robbins Geller has extensive experience litigating class actions and has proven its willingness to commit substantial time and resources to representing the Class.  *See* Boardman Decl. Ex. C.  Accordingly, Lead Plaintiff respectfully requests that the Court appoint Robbins Geller as Class Counsel pursuant to Rule 23(g).

**IV.**      **CONCLUSION**

Lead Plaintiff has affirmatively demonstrated compliance with all of the requirements for class certification.  Accordingly, Lead Plaintiff respectfully requests that the Court enter an Order: (i) certifying this action as a class action pursuant to Rule 23(a) and Rule 23(b)(3); (ii) appointing Lead Plaintiff as Class Representative; and (iii) designating Robbins Geller as Class Counsel pursuant to Rule 23(g).

DATED:  June 12, 2020               Respectfully submitted,

                                       ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                       DAVID A. ROSENFELD
                                       ERIN W. BOARDMAN
                                       CHRISTOPHER T. GILROY
                                       PHILIP T. MERENDA

                                                */s/ Erin W. Boardman*
                                           ERIN W. BOARDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)
                                       drosenfeld@rgrdlaw.com
                                       eboardman@rgrdlaw.com
                                       cgilroy@rgrdlaw.com
                                       pmerenda@rgrdlaw.com

                                       *Lead Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Erin W. Boardman, hereby certify that on June 12, 2020, I authorized a true and correct copy of the foregoing Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Erin W. Boardman*
_____
ERIN W. BOARDMAN
